Case No. 23-1566

**In the
United States Court of Appeals
for the Fourth Circuit**

---

GARY WASHINGTON,

*Plaintiff-Appellant,*

v.

THOMAS PELLEGRINI, OSCAR REQUER, and HELEN FAHLTEICH,
Personal Representative of the Estate of Richard Fahlteich,

*Defendants-Appellees.*

---

On Appeal From The United States District Court
For The District of Maryland at Baltimore
Dist. Ct. No. 1:19-CV-2473-RDB (Hon. Stephanie A. Gallagher)

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT
(CORRECTED)**

---

LOEVY & LOEVY
Jon Loevy
Gayle Horn
Roshna Bala Keen
Renee Spence
311 N. Aberdeen, 3rd FL
Chicago, Illinois 60607
(312) 243-5900

*Counsel for Plaintiff-Appellant*

October 24, 2023

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1566__        Caption: __Gary Washington v. Thomas Pellegrini, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Gary Washington__
(name of party/amicus)

_____

 who is _____Plaintiff-Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                            ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s Renee Spence                         Date:        June 14, 2023

Counsel for: Gary Washington

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF ISSUES ..........................................................3

STATEMENT OF CASE ...........................................................4

    The Murder of Faheem "Bobo" Ali.............................................4

    The Police Decide On The Shooter
    Without Any Investigation ................................................5

    Defendants Fabricate A Statement Against Gary Washington
    And Force 12-year-old Otis Robinson To Sign It ...........................6

    Otis' Third Statement: Another Fabricated Report .........................9

    Defendants Fabricate An Identification
    From 13-year-old Rozetta Dorsey .........................................11

    Washington is charged and convicted based on false witness testimony and
    due to suppressed evidence...............................................15

    Washington's Extensive Damages .........................................16

Procedural History ...........................................................17

SUMMARY OF ARGUMENT ........................................................21

ARGUMENT ....................................................................22

I.    COLLATERAL ESTOPPEL DOES NOT BAR WASHINGTON'S §1983
    CLAIMS ..................................................................22

A.    Applicable Legal Standard and Summary of the Argument ...............23

B.    Judge Schwait's 1999 Order Is Not Valid and Final .........................26

    1.    Vacated Criminal Convictions, and the Orders
           Intertwined With Those Convictions,
           Do Not Have Preclusive Effect..................................................26

    2.    The District Court Erred In Finding That the 1999 Order Was
           Exempted From the General Rule Rejecting Collateral Estoppel
           In These Circumstances ...........................................................29

    3.    The 1999 Order Cannot Be Considered Valid and Final After
           the 2016 Order .........................................................................37

C.    The 1999 Order Was Cursory and Ambiguous As To Its Factual
        Findings, Such That The "Actually Determined"
        Element Cannot Be Met ....................................................................39

D.    Applying Collateral Estoppel In This Case
        Is Inequitable ...................................................................................41

II.    Washington's Fabrication Claim Should Be Tried by a Jury........................43

A.    The District Court's Error in Precluding Washington from
        Challenging Otis's Statements
        and Identifications Warrants Reversal ..................................................44

B.    The District Court Erred in Finding Rozetta's Fabrication
        Immaterial ........................................................................................45

    1.    When Otis's statement is properly considered,
           there was no probable cause .....................................................46

    2.    Rozetta's Statement did not have to be introduced at trial to
           deprive Washington of his liberty............................................47

ii

III.   A Trial Is Required on Washington's
       Suppression of Evidence Claim.......................................................50

IV.    Washington's Federal Unlawful Detention And
       Malicious Prosecution Claims Must Be Tried.............................57

V. Washington's Intentional Infliction of
Emotional Distress Claim Must Be Tried.................................57

CONCLUSION .......................................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

*Aguillard v. McGowen*, 207 F.3d 226 (5th Cir. 2000)..............................27

*Allen v. McCurry*, 449 U.S. 90 (1980) .....................................................33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................56

*Barbee v. Warden, Md. Penitentiary*,

    331 F.2d 842 (4th Cir. 1964)...........................................................57

*Barnett v. Cabell County Comm'n*, No. CV 3:22-0203,

    2023 WL 2602509 (S.D.W. Va. March 22, 2023) ........................48

*B.N. v. K.K.*, 312 Md. 135, 148 (Md. Ct. App. 1988) ...........................59

*Bermudez v. City of New York,*

    790 F.3d 368 (2d Cir. 2015)..................................28, 29, 31, 34, 41

*Brengle v. Greenbelt Homes, Inc.*,

    804 F. Supp. 2d 447, 455 (D. Md. 2011) ................................58, 59

*Brisco v. Stinar*, No. 19-CV-7233,

    2020 WL 7027719 (N.D. Ill. Nov. 30, 2020) ...............................26

*Brown v. City of Chicago*, 599 F.3d 772 (7th Cir. 2010) ......................41

*Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834,

    2017 WL 4947004 (D. Md. Oct. 31, 2017) ...........................47, 58

*Calhoun-El v. State*, 2020 WL 2991786

    (Md. Ct. Spec. App. June 4, 2020) ...............................................36

*Campbell v. Lake Hallowell Homeowners Ass'n*,

    852 A.2d 1029 (Md. Ct. Spec. App. 2004)..............................23, 39

*Campbell v. State*, 373 Md. 637 (2003) .................................................38

*Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985) .................................27, 423

*Donald v. Outlaw*, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023)............34

*Dukes v. City of Albany*, 289 F. Supp. 3d 387 (N.D.N.Y. 2018).............34

*Estate of Bryant v. Baltimore Police Dep't*, No. CV ELH-19-384,

**iv**

2020 WL 673571 (D. Md. Feb. 10, 2020)......................................................46

*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006).......................................26, 28, 43

*Garrity v. Maryland State Bd. of Plumbing*, 447 Md. 359 (2016)...........................41

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019)..................................................*passim*

*Glenn v. City of Hammond*,

2021 WL 4078063 (N.D. Ind. Sep. 7, 2021) ....................................29, 31, 34

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019)....................................................49

*Gray v. Farley*, 13 F.3d 142 (4th Cir. 1993).............................................................22

*Griffin v. Baltimore Police Dep't*, 804 F.3d 692 (4th Cir. 2015)..............................34

*Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014) .......................................48

*Harris v. Jones*, 380 A.2d 611 (Md. Ct. App. 1977).............................................58, 59

*Heck v. Humphrey*, 512 U.S. 477 (1994) .............................................32, 33, 34

*Howard v. City of Durham*, 68 F.4th 934 (4th Cir. 2023) ...................................45, 55

*Howard v. Dowdy*, No. 1:17-CV-477,

2022 WL 1720156 (M.D.N.C. May 27, 2022).............................................45

*Humbert v. Mayor & City Council of Baltimore City*,

866 F.3d 546 (4th Cir. 2017)........................................................................46

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ....................................48

*Jackson v. Coalter*, 337 F.3d 74 (1st Cir. 2003).......................................................27

*Johnson v. Gondo*, No. CV GLR-19-995,

2020 WL 1529002 (D. Md. Mar. 31, 2020)..................................................50

*Juniper v. Davis*, 74 F.4th 196 (4th Cir. 2023)........................................................49

*Knibbs v. Momphard*, 30 F.4th 200 (4th Cir. 2022) .................................................22

*Korczak v. Sedeman*, 427 F.3d 419 (7th Cir. 2005)..................................................26

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...............................................................56, 57

*Long v. Hooks*, 972 F.3d 442 (4th Cir. 2020)...........................................................48

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) .........................................................46

**v**

*Martin v. Conner*, 882 F. Supp. 2d 820 (D. Md. 2012)..............................................44

*Microsoft Corp. Antitrust Litig.*, 355 F.3d 322 (4th Cir. 2004)................................40

*Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984) ........................22

*Miller v. Prince George's Cty.*, 475 F.3d 621 (4th Cir. 2007) ...........................46, 47

*Mills v. City of Covina*, 921 F.3d 1161,

    1170 & n.2 (9th Cir. 2019)..................................................................................27

*Mitchum v. Foster*, 407 U.S. 225 (1972)...................................................................33

*Montana v. United States*, 440 U.S. 147, 164 n.11 (1979) ......................................43

*Morgan v. Morgan*, 68 Md. App. 85, 94 (1986)........................................................43

*Morgan v. Schott*, 914 F.3d 1115 (7th Cir. 2019) .....................................................32

*No E.-W. Highway Comm., Inc. v. Chandler*,

    767 F.2d 21 (1st Cir. 1985) .................................................................................26

*O'Connell v. Alejo*, No. 18-CV-01359-RBJ,

    2020 WL 1244852 (D. Colo. March 16, 2020) ..................................................28

*Owens v. Baltimore City State's Att'ys Off.*,

    767 F.3d 379 (4th Cir. 2014) .......................................................................50, 57

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019) ...................................................28

*Richman v. FWB Bank*, 712 A.2d 41, 59 (Md. Ct. Spec. App. 1998),

    *aff'd,* 354 Md. 472, 731 A.2d 916 (1999) ........................................................24

*Rizk v. Mehirdel*, No. 14-CV-06434 (HG),

    2022 WL 5184709 (E.D.N.Y. Oct. 5, 2022) ......................................................50

*Schand v. McMahon*, 487 F. Supp. 3d 71 (D. Mass. 2020).................................29, 34

*Schlup v. Delo*, 513 U.S. 298 (1995)..........................................................................59

*Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756 (4th Cir. 2021).....................51

*Shader v. Hampton Imp. Ass'n, Inc.* 443 Md. 148 (2015) ........................................38

*Sheetz v. Wal-Mart Stores, E., L.P.*, No. 4:15-CV-02210,

    2017 WL 5625770 (M.D. Pa. Nov. 22, 2017)....................................................54

*Shipley v. Disney*, No. CV SAG-21-3173,

     2022 WL 2789076 (D. Md. July 15, 2022) ....................................................44

*Siggers v. Alex*, 2021 WL 4391170 (E.D.Mich. Sep. 24, 2021) ......................34, 35

*Smith v. Cain*, 565 U.S. 73 (2012) .........................................................................57

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992)...................................................27

*Swentek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir. 1987)....................................24, 41

*Tillman v. Orange County*, 519 F. App'x 632 (11th Cir. 2013) ..............................27

*Ufheil Const. Co. v. Town of New Windsor,*

     478 F. Supp. 766 (S.D.N.Y. 1979)...................................................................40

*Ufheil Constr. Co. v. Town of New Windsor,*

     636 F.2d 1204 (2d Cir. 1980)...........................................................................40

*United States v. Alahmedalabdaloklah*, 76 F.4th 1183 (9th Cir. 2023) .................49

*United States v. Ayres*, 76 U.S. 608 (1869) ...........................................................27

*United States v. Bagley*, 473 U.S. 667 (1985).......................................................57

*United States v. Williams*, 904 F.2d 7 (7th Cir. 1990)............................................27

*Velez v. City of Chicago*, No. 1:18-CV-08144,

     2023 WL 6388231 (N.D. Ill. Sept. 30, 2023)...............................................49

*Waller v. Dir., Patuxetnt Inst.*, 244 Md. 229 (1966)...........................................35, 36

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) ..........................................44

*Wearry v. Cain*, 136 S. Ct. 1002 (2016).................................................................56

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)........................................48

*Woods by & through Wade v. City of Reno,*

     *Nevada*, 2018 WL 493015 (D. Nev. Jan. 18, 2018).......................................27

*Wyatt v. Cole*, 504 U.S. 158 (1992).........................................................................51

*Youngblood v. W. Virginia*, 126 S. Ct. 2188 (2006) ...............................................56

*Zeneca Ltd. v. Novopharm Ltd.,* 919 F. Supp. 193 (D. Md. 1996) .........................26

**Regulations:**

28 U.S.C. § 1738 ...........................................................................23

28 U.S.C. § 1291 .............................................................................2

28 U.S.C. § 1367 .............................................................................2

28 U.S.C. § 1331 .............................................................................2

**Rules:**

Md. Code Ann., Crim. Proc. § 7-101 et seq ..........................................30

Md. Code Ann., Crim. Proc. § 8-301 et seq..........................................30

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Because this case presents important issues, including the application of collateral estoppel in 42 U.S.C. § 1983 cases, Washington requests that the Court hear oral argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Washington's federal claims under 28 U.S.C. § 1331 and state law claims under 28 U.S.C. § 1367. JA00021. Claims against the Baltimore Police Department were bifurcated. JA03801. On April 12, 2023, the district court granted summary judgment in favor of the individual police officers. JA03837. On May 16, 2023, Washington's request to certify its summary judgment order under Federal Rule of Civil Procedure 54(b) was granted. JA03841. Washington's timely appealed on May 23, 2023. JA03842. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether collateral estoppel applied to bar Washington from arguing that Defendants coerced Otis Robinson, the State's only eyewitness, into adopting Defendants' fabricated statement inculpating Washington in a murder, where a 1999 post-conviction court had found Otis incredible, but a 2016 writ of actual innocence court found Otis's testimony so persuasive it warranted vacating Washington's conviction (which, in turn, vacated all of the prior judgments arising out of that conviction)?

2.    Where the district court's erroneous application of collateral estoppel led it to grant summary judgment on Washington's fabrication, unlawful detention, failure-to-intervene, and intentional infliction of emotional distress claims, because the court improperly precluded Washington from relying on evidence that Defendants fabricated Otis' false identification of Washington, whether reversal on collateral estoppel warrants reversal on these other claims?

3.    Whether the district court erred in granting summary judgment on Washington's suppression claim where Washington presented substantial evidence that the Defendants suppressed (i) initial statements from the only two witnesses that they did not actually see the shooter (and thus contradicted their identifications of Washington), and (ii) evidence that they threatened, fed facts to, and coerced these two witnesses into adopting a fabricated story?

3

## STATEMENT OF THE CASE

For three decades, Gary Washington was imprisoned for a crime he did not commit: the murder of Faheem Ali. JA630, JA572. He has steadfastly maintained his innocence. *See, e.g.,* JA511, JA807.

There was no physical evidence connecting Washington to the crime. JA840.

The evidence used to charge and convict Washington consisted solely of statements taken from two children, who have since testified under oath repeatedly that they did not see who committed the shooting. Otis Robinson and Rozetta Dorsey were only 12 and 13 years old, respectively, when detectives prepared false statements for them to sign implicating Washington in the shooting. With no credible evidence of guilt, Washington's conviction was vacated on August 20, 2018. JA837-842. On January 15, 2019, the State dismissed the charges against Washington.

### The Murder of Faheem "Bobo" Ali

On December 27, 1986, Faheem "Bobo" Ali was shot and killed. JA843.

Washington saw the shooting take place from inside his home at 2328 Barclay Street, Baltimore. JA 744-745. Shortly before the shooting, Washington was downstairs in his basement friend, Lawrence Thomas, and brother-in-law, Ronald Brady. JA723. At some point, Thomas had to leave, so Washington asked Brady to see Thomas out and lock the front door. JA727.

4

Washington then went upstairs. JA744-745. Seeing the front door still open, he went to shut and lock it. JA744-745. When he got to the front door, he saw Thomas, Brady, and Bobo standing outside. JA744-745. Washington saw Thomas pull out a gun and hit Bobo. JA744-745. Bobo raised his hands to shield himself. JA744-745. Thomas's gun went off, hitting Bobo. JA744-745. Bobo ran and collapsed across the street from Washington's residence. JA744-745; JA844. Thomas and Brady then fled toward Camp Street. JA744-745.

**The Police Decide On The Shooter Without Any Investigation.**

The police came and spoke to witnesses who had heard the shot but were not able to identify the shooter, and, at most, could relate only basic characteristics and clothing. JA1057; JA844.

Defendant Requer admits that he set his sights on Washington as a suspect before a single witness mentioned Washington's name, let alone identified him as being involved in the crime. JA1441-1442, JA1454-1455. He had no explanation nor legitimate evidence pointing in Washington's direction. JA1441-1442, JA1454-1455.

All the police knew was that the victim's body was found across the street from Washington's home. Additionally, interviews at the scene indicated that the victim had been speaking with Washington's brother Ricky (not Washington) in front of 2328 Barclay sometime earlier that day. JA845.

5

Finally, an anonymous tip stated that a "Gary Ward" (again, not Washington) was involved. JA1451-1452; JA845. The tip was all it took for Requer to target Washington. JA1449-1455. Requer admits he assumed Gary Ward was a mistaken reference to Washington, even though the last names sound nothing alike, and no one had seen Washington at the crime scene. JA844-845; JA1432, JA1445, JA1447, JA1455. Based on these tenuous connections, Defendants decided Washington was the perpetrator and set to manufacture supporting witnesses.

### Defendants Fabricate A Statement Against Washington And Force 12-year-old Otis Robinson To Sign It.

On the night of the murder, a 12-year-old child named Otis Robinson was at 2311 Barclay Street, at his mother's boyfriend's home. JA1622.  His mother sent him to the store. JA1622. In the dark, he saw three men across the street in front of Washington's house, talking. JA1623. As Otis began walking, he heard a gunshot. JA1623.

Otis did not see any of the men's faces and could not provide the police with any additional information about the shooting. JA1622. Nevertheless, BPD detectives interrogated Otis at police headquarters without his mother present. JA1624-1625; JA1675; JA1626; JA1708-1709. Otis told them the truth: he saw three guys standing across the street talking, heard a gunshot, and so ran back to 2311 Barclay. JA1704-1705. Otis told Defendants he could not identify any of the men. JA1627.

6

Defendants, including Pellegrini, wrote down Otis's initial, truthful statement. JA1627-1628, JA1634; JA1635. But Defendants did not have Otis sign the statement, nor did they disclose it to the prosecution. *See* JA241-JA245 (disclosing no exculpatory statement).

Rather, Otis's signed, written statement, the one Defendants used as the basis for Washington's prosecution, was in fact Otis' *second* statement, which they misrepresented as his first. JA1629-1630. That second statement is false, and Defendants knew it.

Otis had already told Requer, Fahlteich, and Pellegrini that he observed the lead-up to the shooting but did *not* see the shooting itself, nor the shooter. In response, they accused young Otis of lying and threatened to take him away from his mother forever. JA1630. They even accused him of "setting" Bobo up. JA1706-1707. Otis insisted he was telling the truth, but that only made the detectives get louder. JA1706-1707. They repeatedly told Otis they suspected Washington. JA1631, JA2110-2112.

 It was Defendants, not Otis, who identified Washington as the shooter. JA1654 (Q: "You told all of that to [the detectives]; isn't that right?" A: "They told me Washington was the shooter."). Detectives fed Otis the "fact" that "Gary hit Bobo in the jaw, then drawed his gun." JA1723. They also fed Otis "facts" incorporated into his false written statement: the getaway car was red; the men

7

involved in the shooting were "arguing over money"; and the victim's name, Bobo. JA1673-1674; JA1720, JA1707. *See also* JA1731-1732, JA1880, JA1882, JA1898.

Additionally, Requer showed Otis individual photos of Washington and Ricky, asking whether Otis thought Washington did the shooting. JA1709-1715. Otis knew Washington and Ricky from the neighborhood but could not identify the shooter—as he had told Defendants. JA1709-1714; JA1627-1628. Requer told Otis Washington and Ricky "were bad dudes," and Fahlteich told Otis that either Washington or Ricky shot Bobo. JA1711-1712. A Defendant said, "We know one of them did it." JA1714. Requer kept pointing his finger on the top of Washington's picture—singling him out. JA1710.

After this, Defendants introduced a photo array of six mugshots that included Washington and Ricky's photos. JA3847.[1] They told Otis they knew "one of them did it, all you got to do is point one of them out." JA1714. Otis understood that Defendants "wanted [him] to go along with them" and identify one of the two brothers. JA1715. Otis selected Washington's picture because Requer kept tapping it with his finger. JA1715-1716.

For much of this interrogation, which alternated between threats and feeding Otis facts, Otis's mother was not present in the room with him. JA1709.

---

[1] Defendants also showed Otis a picture of Lawrence Thomas and mentioned him by name, asking if Otis knew him. JA1663. Otis said he did not. JA1663.

Defendants understood this violated BPD policy. JA1097; JA1295-1296.

Defendants sent Otis' mother from the interrogation room so they could question

him without her. JA2217-2220. Otis' mother recalled he was afraid, confused, and

crying. JA2217-2220.

Omitting what Otis actually saw and Defendants' threats and blatant fact-

feeding, Defendants fabricated that Otis identified Washington as the shooter.

Defendants prepared a handwritten question-and-answer style "statement,"

attributed to Otis, in which they falsely reported that Otis made an untainted photo

identification of Washington and that Otis saw Washington argue with and shoot

Bobo. The report omitted the suggestive actions Defendants used during the

identification procedure and simply reported that Otis "indicate[d] the picture of

the person who shot [Bobo]." JA2397. Because of Defendants' pressure and

intimidation, on December 29, 1986, Otis signed this fabricated handwritten

statement falsely implicating Washington as Bobo's shooter. JA2394-2397;

JA1685.

### Otis' Third Statement: Another Fabricated Report

On January 2, 1987, Defendants brought Otis back to the station to sign

Defendant's typed statement, prepared by Requer, falsely implicating Washington.

JA 1689-1690; JA2398-2402. Again, the statement contained falsehoods, supplied

by Defendants, about Otis observing Washington arguing with and shooting the victim. JA01730-01733.

Defendants also showed Otis a different photo array, again with Washington's photograph. JA01733-1735; JA3849-3856. Otis again selected Washington because he "just wanted to get out of the police station, and went along with what they said." JA1733.

As with the first false statement four days earlier, Otis adopted Defendants' typed false statement because he was scared and knew Defendants were not going to release him until he "agreed to do what they…coerced [him] to do." JA1888; JA1633. Otis expressly testified he was being held against his will and was not free to leave. JA1634; JA1888.

Otis parroted his false statement at the grand jury proceeding for the same reason: Pellegrini was present, he was "scared," and "felt as though they wasn't going to leave [him] alone unless [he] did what they wanted [him] to do." JA1639. Defendants did not disclose to the prosecution or defense the true circumstances of Otis' statements -- that he had not been able to identify the shooter, detectives told him who to implicate, and he was threatened and coerced into adopting the false statement. JA1121-1123.

In 1999, Otis was finally able to testify about what Defendants had done. JA1646. He again disavowed the false police statement at a hearing on

10

Washington's writ of actual innocence in 2017, and at his 2021 deposition. JA2101, JA2108; JA1719-1720, JA1723-1724, JA1731-1732.

**Defendants Fabricate An Identification From 13-year-old Rozetta Dorsey**

Defendants also manufactured an identification from Rozetta Dorsey, a 13-year-old girl. Rozetta recognized the victim but could not identify the shooter, which is what she told police at the scene when she was interviewed. JA2524-2525, JA2540.

The day after the shooting, Defendants circulated a report alluding to a juvenile female interviewed at the homicide office who saw some of the incident, stating that this juvenile saw a black man get out of a yellow car, shoot the victim, and immediately drive off. JA1618. The report states that the witness could give "no further description" beyond "black male." JA1618.; JA1434. A subsequent report three days later, also by Requer and Pellegrini, suggests that this witness was Rozetta. JA844-845.

Neither report attributes any physical descriptions—let alone names—of the shooter or driver to Rozetta. Had Rozetta been able to provide a description or name, that information would have been included. JA1434-1435. The only plausible explanation for why the reports contains no suspect name or descriptions is that the witness stated that she did not know what the shooter(s) looked like, or who they were—thus "no further description" provided.

11

Intent on implicating Washington, *see supra* at 5, Requer began asking Rozetta about Washington and Ricky. JA845. But Rozetta could not identify the shooter. She firmly denies telling Defendants she could identify the shooter or knew who the shooter was. JA2561-2562, JA2599, JA2600, JA2674, JA2675. Rozetta told them the opposite, but this was never disclosed to the defense or to the prosecution. JA2437-2438, JA2590; *See* JA241-245 (contains no disclosure).

Indeed, Defendants did not document the true circumstances around their initial encounter with Rozetta—*e.g.*, that if indeed Rozetta was interviewed at the homicide office, it was without a parent present—contrary to department policy and Defendants' normal practice. JA1295-1296; JA1010; *see also* JA843-845; JA1618.

What is clear, however, is that Rozetta could not describe or identify the shooter when first questioned. It was not until Requer and Pellegrini brought Rozetta to the homicide unit on January 3, that they obtained a signed statement from her. *See* JA2738-2742. By this point, they had secured the false statements from Otis. JA2394-2402. Perhaps concerned that 12-year-old Otis would not stand by his false identification and would instead tell the truth (that he could not identify Bobo's assailants), Requer and Pellegrini attempted to lock-in a second witness by targeting another vulnerable child.

12

Defendants arranged to pick up Rozetta and her mother on January 3 in an unmarked car. JA2462-2463. BPD Policy required minors to be questioned with a legal guardian present, and Requer knew this policy. JA1295. Likewise, Requer knew that it would be improper to take a statement from a minor child whose parent was intoxicated or high during the interview. JA1538, JA1539. But that is precisely what he did. Rozetta's mother was visibly high and nodding off in the police car when they rode to the station on January 3, 1987. JA2464, JA2550-2551.

When they got to the station, Rozetta's mother went to a separate room with Defendants for twenty to thirty minutes. JA2467-2468. When Rozetta's mother and Defendants reentered the room together, Requer and Pellegrini began questioning Rozetta. JA2553-2554.

Rozetta told the detectives that she did not see the shooter and could not identify the perpetrator. JA2562, JA2590. Defendants had been taking notes during their interview of Rozetta, *see* JA 2672, but those were never disclosed. *See generally* JA241-245. Defendants presented Rozetta with a photo array, which included a photograph of Washington. JA2479-2481. Defendants admit they knew Rozetta was familiar with Washington from living in the neighborhood. *See* JA59; JA2745 (describing Washington as a "person known to [Otis and Rozetta]"); JA2481. They asked Rozetta to select who looked familiar. JA2480-2481, JA2558-

13

2559. She selected Washington's photo and initialed it. JA2559-2560. Rozetta never identified Washington as the perpetrator. JA2560.

Nevertheless, Defendants falsely characterized Rozetta's identification as being of the shooter. *See* JA2744 (Rozetta "positively identified" the photo of Gary Washington [as the shooter]). At no time did they reveal the true circumstances of their interrogation, or that they had asked Rozetta only to identify a familiar-looking person, *not* the shooter. JA2744; JA2748; JA1980-2094; JA2802.

Defendants followed up by giving Rozetta a typed statement to sign that identified Washington as the shooter, even though they knew the statement was false because Rozetta (i) told them she could not identify the shooter, (ii) had not described or identified the shooter previously, and (iii) was asked to pick out the person who was familiar, not who committed the crime. *Compare* JA2738-2742 *with* JA2480-2481, JA2562, JA2590.

Rozetta was nervous. JA2580. Her mother, who was high and had been in private contact with the detectives, told her to sign it, and so Rozetta did so without reading it. JA2578-2579. She relied on her mother and also felt she could not understand some of the words in the statement. JA2578-2579.

The January 2 statement is Rozetta's only signed statement. Rozetta has never stated that she saw Washington shoot Bobo or that she saw the shooting at all. Before trial when a defense investigator interviewed Rozetta, she disavowed

14

the statement. JA2752, JA2795, JA2800. The State never called her to testify.

JA2795, JA2800.

**Washington is charged and convicted**
**based on false witness testimony and due to suppressed evidence**

Washington was charged and later convicted of Bobo's murder because of

the false statements from these two vulnerable children, and nothing more.

JA2748; JA2743-2747; JA2802.

Moreover, the prosecutor undoubtedly relied on Otis and Rozetta's false

statements to seek the indictment against Washington. Requer's practice was to

communicate regularly with the prosecutor about evidence being gathered—

including witness statements—prior to arresting a suspect. JA1326-1328. Otis and

Rozetta's signed (false) statements were in the police file, *see* JA2018-2022,

JA2024-2028, JA2031-2034, and therefore would have been provided to the

prosecutor before Washington's arrest and charging. *See* JA1329-1330. *See also*

JA1326. Requer and Pellegrini also submitted their Prosecution Report to the

prosecutor, in which they presented their false, fabricated account of what Otis and

Rozetta saw. JA2802; JA1325-1326.

Defendants also created additional fabrications about Otis. In their

Prosecution Report, they now claimed that Otis saw Washington *get out of a car*,

call to Bobo, who then approached, after which Washington shot him. JA2802.

This detail conformed Otis' supposed observations to Rozetta's. *Compare* JA2802

15

with JA2398-2402, JA2738-2742.  At no time did Defendants tell the prosecutor that they had fabricated either witness's account. JA2972-2973, JA2978.

Before trial, the State filed its discovery disclosures. JA241-242; JA 243-245. The disclosures stated that the State was unaware of any exculpating or impeaching evidence. *See* JA242; JA244. Due to Defendants' suppression, the State was unaware, and thus did not disclose, that both Otis and Rozetta told Defendants that they could not identify the shooter and that their identifications were products of Defendants' coercive tactics. If Defendants had relayed these facts to the prosecution, the prosecutor's practice was to disclose this type of evidence to the defense. JA2929-2930, JA2970-2974, JA2976-2978, JA2982.At Washington's pre-trial suppression hearing to exclude Otis and Rozetta's false identification, Pellegrini did not disclose either's admissions that they could not identify the shooter, nor did he disclose Defendants' role in manufacturing the accusatory signed statements. *See id.* JA2782-2798.

### Washington's Extensive Damages

Washington endured more than three decades in prison, during which he lost his liberty and also contact with his family. He was unable to raise his son, who was only three years old when Washington was taken away. Washington testified that his wrongful incarceration was "inhumane": He was subject to repeated lockdowns, where he could not leave his cell at all; his cellmates were often

unpredictable and suffered from severe mental illness; correctional officers would scream at him and use violence towards him; he was subject to repeated shakedowns and strip and cavity searches; and he was isolated from his family and friends. JA621-627; JA3343-3344 4. Since leaving prison, Washington continues to suffer from sleep deprivation and has nightmares about the inhumanity of his wrongful conviction and imprisonment. JA621-622.

## Procedural History

On June 16, 1987, Washington was convicted of first-degree murder and use of a handgun. JA311. He was sentenced to life in prison. JA311.

On February 24, 1997, Washington filed a Petition for Post-Conviction Relief, pursuant to Maryland's Uniform Post-Conviction Procedures Act. JA273. Washington alleged, *inter alia*, that his Fourteenth Amendment due process rights were violated because police investigators coerced the only identification witness, Otis, to testify falsely. JA273-276.

The Circuit Court for Baltimore City held hearings on the petition. JA273. At the hearing, Otis, now an adult, took the stand and admitted that his prior identification of Washington was false. JA1623-1646. Otis testified that on the night of the murder, he saw three men standing together but could not identify them. JA1623-1624. He heard a gunshot, but he did not see who the shooter was. JA1624-1625. He testified that he and his mother went to the police station,

17

where he told Pellegrini and Fahlteich that he could not identify anyone from the shooting. JA1626-1628. About the police interrogation, Otis testified in detail about how Defendants threatened to take him from his mother and intimidated him into making false statements about and identifications of Washington. JA1629-1635; Their tactics also included singling out a photograph of Washington. JA1632.

On December 10, 1999, Judge Schwait of the Circuit Court for Baltimore City denied Washington's petition and did not set aside the conviction. JA282. He held that Washington did not present sufficient evidence of police coercion and found Otis's testimony "incredible." JA274-276.

 On November 28, 2016, Washington sought a writ of actual innocence ("WAI") pursuant to Section 8-301 of the Maryland Criminal Code. JA311. The Circuit Court for Baltimore City, Judge Peters, held evidentiary hearings. JA311. Otis again testified, consistently with his 1999 sworn testimony, that he (1) did not see the shooter and thus, could not truthfully implicate Washington and (2) his earlier identification, given to the grand jury and criminal trial, were made under pressure from the police to adopt a false account.  JA312-316.

The court considered Otis's multiple recantations, including his 1999 testimony and his 2016 testimony. JA312-316. It concluded that Otis "never wavered in his formal withdrawal or renunciation of [his] prior

18

testimony.'" JA315. It further noted that Otis had recanted his trial testimony "on at least three occasions," including when he was approximately 18 to 20 years old, when he was 24 years old, and most recently when he was 42 years old (for which he traveled out of state voluntarily). JA315. It reached the "inescapable conclusion" that "multiple recantations of the uncorroborated testimony by the sole eyewitness in Petitioner's case have to create a substantial possibility of a different result" at Washington's criminal trial. *Id.* at JA315-316. The circuit court set aside Washington's conviction and granted a new trial "based on the [Otis] Robinson recantations." *Id.* at JA316. (hereinafter, "2016 Order").

On September 5, 2019, Washington filed an Amended Complaint alleging that Defendants Thomas Pelligrini, Oscar Requer, Richard Fahlteich, Fred Ceruti, John Tewey, John MacGillivary, Baltimore Police Department ("BPD") and the Mayor and City Council of Baltimore (collectively "Mayor") violated his constitutional and state law rights during their investigation of Faheem Ali's homicide and subsequent prosecution of Washington; and that those violations were undertaken pursuant to the policies and practices of the BPD. JA19-50. Over Washington's objection, Washington's *Monell* claim was bifurcated. JA3801.

On September 15, 2022, Pelligrini, Requer, Fahlteich, Ceruti, and Tewey filed for summary judgment. JA52-92. Washington did not oppose summary judgment as to Ceruti and Tewey but opposed as to the remaining Officer

19

Defendants. JA428-484. On April 12, 2023, the district court granted summary

judgment. JA3801-3837.

# SUMMARY OF ARGUMENT

The evidence at summary judgment presented a genuine issue of material fact that warrants a trial. The district court agreed, but granted Defendants' motion nonetheless, largely on the basis of collateral estoppel. In particular, the district court found that Washington was estopped from arguing that Defendants coerced Otis into a falsely identifying Washington as the shooter because a 1999 post-conviction ruling found Otis's recantation was not credible—notwithstanding a 2016 writ of actual innocence ("WAI") decision finding the exact opposite and vacating Washington's conviction.

But collateral estoppel does not and cannot apply. First, the elements of collateral estoppel have not been satisfied: The 1999 ruling has no preclusive effect once Washington's conviction was vacated, and is therefore, not a valid and final order. Nor did the 1999 ruling delineate what issues were actually determined. Second, collateral estoppel is an equitable doctrine and inequity would result if Washington was barred from arguing that Otis's statements and identification were coerced and fabricated, particularly where a 2016 judge credited Otis's testimony on that score.

Once the district court's error in applying collateral estoppel is rectified, Washington's federal and state law claims clearly survive summary judgment. The district court's erroneous collateral estoppel ruling infected all these claims, save

Washington's suppression claim. For that claim, the district court held that Washington's evidence was too speculative. But in so ruling, the court not only overlooked Defendants' evidence of withholding, but also failed to properly credit evidence demonstrating that Defendants withheld the coercion they used to obtain fabricated evidence against Washington.

## ARGUMENT

This Court reviews *de novo* the district court's grant of summary judgment, including its collateral estoppel determination. *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022); *Gray v. Farley*, 13 F.3d 142, 145 (4th Cir. 1993).

## I.    COLLATERAL ESTOPPEL DOES NOT BAR WASHINGTON'S §1983 CLAIMS.

At summary judgment, the district court erroneously held that Washington was collaterally estopped by Judge Schwait's 1999 Order from asserting claims under § 1983 that relied on proving Otis's police statement was false and coerced. The district court bound Washington to Judge Schwait's credibility determination—upon which Judge Schwait affirmed the validity of Washington's conviction—even though a different court later found that Otis's recantations required that same conviction be set aside and a new trial granted. That error infected the court's entire opinion and led to the improper grant of summary judgment on Washington's fabrication, conspiracy, and malicious prosecution claims. The district court's unwarranted application of collateral estoppel runs

contrary to the overwhelming weight of authority and violates the equitable principles underlying this doctrine. Once that legal error is untangled, it is clear that Washington is not precluded from bringing his civil claims.

### A. Applicable Legal Standard and Summary of the Argument.

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts are required to "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). The question is thus whether Maryland courts would give preclusive effect to the 1999 Order despite a subsequent order, from the same court, reversing the earlier order and setting aside the conviction on which the 1999 Order was based. The answer is no.

Maryland law requires the following elements to be met to invoke collateral estoppel: "(1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum." *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1037-38 (Md. Ct. Spec. App. 2004).

Even if the technical elements of estoppel are met, moreover, it cannot be applied to produce an inequitable result. At its core, collateral estoppel is an equitable doctrine designed to promote efficiency and consistency among judicial decisions from different courts. *See Richman v. FWB Bank*, 712 A.2d 41, 59 (Md. Ct. Spec. App. 1998), *aff'd,* 354 Md. 472, 731 A.2d 916 (1999). Its function is to "avoid the expense and vexation attending multiple lawsuits, conserve[] judicial resources, and foster[] reliance on judicial action by minimizing the possibilities of inconsistent decisions." *Id.* Ultimately, courts must weigh the fairness to the party against whom collateral estoppel is applied. *Swentek v. USAIR, Inc.*, 830 F.2d 552, 563 (4th Cir. 1987).

The district court's collateral estoppel analysis erred in several respects, any one of which supports reversal on appeal.

First, the 1999 Order does not meet the elements of collateral estoppel because it is no longer a valid and final order. Federal courts routinely reject collateral estoppel where, as here, the underlying criminal conviction has been vacated. The 2016 Order set aside Washington's conviction on actual innocence grounds and ordered a new trial at which Otis's full account could be heard. Upon the issuance of this new decision, prior orders tethered to Washington's criminal conviction – including the 1999 Order affirmance of that conviction – are no longer valid and lack preclusive effect. No other result makes sense: the 1999

24

Order and the 2016 Order ordered exactly opposite relief, with the former affirming a conviction while the latter decision vacating that same conviction. It defies logic and offends the judicial principle of avoiding inconsistent judgments for both orders to remain valid and final.

Second the 1999 Order is at best ambiguous on which factual issues it "actually determined." A reviewing court cannot properly attach estoppel to any particular factual finding from that Order, let alone conclude that there is sufficient identity between those issues and the issues in a subsequent proceeding. Thus, the second element of collateral estoppel cannot be met.

Third, equitable considerations demand reversal of the district court order. Most notably, newly discovered evidence undermines Judge Schwait's ruling, presents a compelling case of innocence, and caused the state court to order a new trial. Given this new evidence, binding Washington to a now-discredited order and barring him from seeking relief for his constitutional violations would be grossly unjust.

Taking a step back, the federal courts must give Judge Schwait's Order the same treatment that another Maryland court would afford it. This Court need look no further than Washington's 2016 Order to find that the Maryland courts did not consider themselves bound by a lone credibility finding, issued seventeen years

earlier and without the benefit of credible new evidence of innocence; the federal courts should not, either.

### B.  Judge Schwait's 1999 Order Is Not Valid and Final.

#### 1.  Vacated Criminal Convictions, and the Orders Intertwined With Those Convictions, Do Not Have Preclusive Effect.

To begin, Judge Schwait's 1999 order no longer has the force of a valid and final judgment because the conviction it upheld was invalidated. *See, e.g., Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019) (rejecting estoppel in §1983 suit after conviction was vacated, where criminal defendants presented new evidence post-judgment and where conviction was allegedly procured through fraud or other improper means); *Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006) (estoppel unavailable in §1983 suit because, among other reasons, convictions vacated upon discovery of new evidence).

It is "hornbook" law that a vacated judgment has no preclusive effect for purposes of collateral estoppel. *See Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) (Illinois law); *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985); *Zeneca Ltd. v. Novopharm Ltd.,* 919 F. Supp. 193, 196 (D. Md. 1996) ("As a general rule, a vacated judgment and the factual findings underlying it have no preclusive effect; the judgment is a legal nullity."). *See also Brisco v. Stinar*, No. 19-CV-7233, 2020 WL 7027719, at *8 (N.D. Ill. Nov. 30, 2020)

(collecting cases and stating that "federal appellate courts around the country recognize that a vacated judgment has no preclusive effect for purposes of collateral estoppel."); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4432 (3d ed.) ("There is no preclusion as to the matters vacated or reversed.").

In the criminal context, federal courts consistently hold that once a conviction has been vacated, it has no preclusive effect and cannot bar federal constitutional challenges to a wrongful conviction. *See, e.g., Stone v. Williams,* 970 F.2d 1043, 1054 (2d Cir. 1992) ("A judgment vacated or set aside has no preclusive effect."); *Jackson v. Coalter*, 337 F.3d 74, 85 (1st Cir. 2003) (same); *Aguillard v. McGowen*, 207 F.3d 226, 229, 231 (5th Cir. 2000); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985); *Mills v. City of Covina*, 921 F.3d 1161, 1170 & n.2 (9th Cir. 2019); *Tillman v. Orange County*, 519 F. App'x 632, 637-38 (11th Cir. 2013) As an initial matter, therefore, Washington's vacated conviction is no bar to the present suit.[2]

---

[2] It makes little sense to bind criminal defendants to factual findings about a conviction that has since been rendered a legal nullity. *See United States v. Williams*, 904 F.2d 7, 8 (7th Cir. 1990) (when a conviction is vacated, "the effect is to nullify the judgment entirely and place the parties in the position of no trial having taken place at all; thus a vacated judgment is of no further force or effect"). *See also United States v. Ayres*, 76 U.S. 608, 610 (1869) (vacated conviction is a legal nullity); *Woods by & through Wade v. City of Reno, Nevada*, 2018 WL 493015, at *10 (D. Nev. Jan. 18, 2018) (same).

Not only does the vacated criminal judgment lose any preclusive effect, but so, too, do the judicial decisions arising out of and based on that conviction. *E.g.*, *Bermudez v. City of New York*, 790 F.3d 368, 374 (2d Cir. 2015) (plaintiff not collaterally estopped from arguing witnesses were coerced, even though their testimony was found "not credible" in a prior federal habeas proceeding, where conviction was subsequently vacated on a state motion for new trial); *Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019) (decisions "merged with" vacated conviction do not collaterally estop §1983 claims arising out of conviction); *Evans*, 445 F.3d at 955-56 (concluding that because the plaintiff's criminal convictions were vacated and his criminal record expunged, there is nothing left on which preclusion could be based); *O'Connell v. Alejo*, No. 18-CV-01359-RBJ, 2020 WL 1244852, at * 4 (D. Colo. March 16, 2020) vacatur overturned not only the judgment of guilt but also the interlocutory decisions preceding it).

In *Peterson v. Heymes*, for example, the Sixth Circuit held that a pre-trial suppression ruling allowing the plaintiff's confession to be admitted at the criminal trial did not collaterally estop the plaintiff from bringing a §1983 civil suit challenging the voluntariness of that confession once the conviction had been vacated. 931 F.3d at 554-55. The criminal court's interlocutory rulings merged with the final judgment, which means those interlocutory rulings had been vacated too. *Id.* at 554.

28

This rule is not limited to pretrial rulings but applies with equal force to post-conviction reviews of the conviction. *See Glenn v. City of Hammond*, 2021 WL 4078063, at *7-9 (N.D. Ind. Sep. 7, 2021) (federal courts have "declined to give preclusive effect to collateral proceedings that were based on subsequently vacated criminal convictions"); *Bermudez*, 790 F.3d at 374 (no preclusive effect to adverse post-conviction habeas findings once conviction was subsequently vacated); *Schand v. McMahon*, 487 F. Supp. 3d 71, 78 (D. Mass. 2020) (post-conviction ruling lost preclusive effect after conviction vacated). Practically speaking, "the decisions in the collateral proceedings were necessarily based on the factual and legal decisions in the criminal cases being collaterally challenged." *Glenn*, 2021 WL 4078063, at *7-9.

### 2. The District Court Erred In Finding That The 1999 Order Was Exempted From the General Rule Rejecting Collateral Estoppel In These Circumstances.

The district court accepted the principle that collateral estoppel cannot apply to rulings made in the criminal proceeding. JA03658-03659 ("I completely agree with you with respect to the criminal proceeding."). Nevertheless, and notwithstanding the weight of authority to the contrary, the district court erroneously held that the 1999 Order could not be "affected by what happened in the criminal proceeding" because it was issued in a "separate proceeding"— namely, Washington's post-conviction petition. JA03658-03659; JA03825-03826.

29

The district court reasoned that vacation of the conviction "did not alter the validity or finality of [the 1999 Order] denying post-conviction relief, or the factual determinations he made therein." JA03825-03826. In other words, the district court construed the 1999 Order as still valid and final even though the criminal conviction it upheld was itself no longer valid and final. The court thus concluded that collateral estoppel barred Washington's core constitutional claims.

In finding Washington's civil claims collaterally estopped, the district court fundamentally misunderstood the nature of Washington's post-conviction petition. The 1999 Order was issued in a state post-conviction proceeding brought under the Uniform Postconviction Procedure Act ("UPPA"). Md. Code Ann., Crim. Proc. §7-101 et seq. The express purpose of this provision was to allow convicted persons to challenge an unconstitutional judgment or sentence. *Id.* at § 7-102. Section 7 permitted the same types of collateral challenges "that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy." *Id.* at (a)(1)-(4). In other words, the UPPA is simply one pathway for attacking the validity of a conviction—no different from other forms of postconviction review, such as writs of actual innocence, that enabled convicted persons to attack an extant criminal conviction. *Compare* Md. Code Ann., Crim. Proc. §8-301 et seq. The remedy under Section 7 is, thus, solely about the conviction, i.e., "to set aside or correct the judgment or sentence." *Id.* at (b)(1).

The district court misunderstood this relationship, believing incorrectly that the "post-conviction proceeding does not suspend the underlying conviction's finality." JA03825. That is wrong: the *only* function of the post-conviction proceeding is to set aside or affirm the conviction; there is no other purpose to it.

While post-conviction proceedings are indeed collateral, they are predicated on, and inextricably intertwined with, the underlying criminal convictions they seek to challenge. And when the conviction is vacated, they lose their preclusive effect, just as pre-vacatur orders tied to the criminal judgment do. *See Glenn*, 2021 WL 4078063, at *7-9 (N.D.Ind. Sep. 7, 2021). That the 1999 Order was issued in a collateral proceeding, as opposed to a direct appeal, is irrelevant. *See Bermudez*, 790 F.3d at 374 (federal habeas findings were not preclusive where conviction was subsequently vacated).

It is particularly untenable to treat the 1999 Order as a presently "valid and final" order given that it has effectively been reversed by the Circuit Court of Baltimore. Judge Schwait affirmed Washington's conviction and rejected the claim that it should be set aside, even though the only witness to implicate Washington at trial had recanted. Seventeen years later and with new evidence available, Judge Peters reversed the same conviction and accepted the claim that it should be set aside, because the only witness to implicate Washington at trial had recanted. To do so, Judge Peters found that Otis' "multiple recantations" (which included Otis'

1999 post-conviction testimony that Judge Schwait dubbed "incredible") had "create[d] a substantial possibility" that Washington would have had a different result at his criminal trial. JA00315-00316. In other words, these two rulings ordered diametrically opposite relief. The later order governed, and Washington's conviction was set aside. Amid those facts, the earlier order simply cannot be construed as "valid and final." A contrary ruling would flout the basic purpose of collateral estoppel to avoid inconsistent judgments.

Federal accrual law – which shares many of the equitable considerations underpinning the collateral estoppel doctrine –underscores the conclusion that Washington's post-conviction decision was functionally part of the underlying criminal proceeding and lost any preclusive effect once his conviction was vacated. Like with collateral estoppel, accrual law seeks to avoid inconsistent judgments, including between state and federal courts. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Morgan v. Schott*, 914 F.3d 1115, 1120 (7th Cir. 2019) (noting that "the *Heck* rule is a version of issue preclusion"). There can be no §1983 judgment that conflicts with an extant state-court conviction. *Id.* Conversely, an invalidated state judgment cannot bar a federal claim, either under collateral estoppel or as a matter of accrual. *See Gilliam*, 932 F.3d at 242 n. 9. For that reason, the Fourth Circuit has "question[ed] whether a state's collateral estoppel doctrine can require a federal court to afford preclusive effects to an *invalid* state judgment in a federal §1983

32

case. Such an outcome would conflict with the Supreme Court's holding in *Heck v. Humphrey*, which specifically permits a plaintiff to proceed with a § 1983 action when a conviction has been reversed, expunged, or declared invalid…" *Id.* Civil claims do not accrue, therefore, unless and until the conviction is vacated. *Id.*[3]

Importantly, *Heck* and progeny do not differentiate between the various procedural mechanisms by which a conviction is vacated. A direct appeal, collateral state attack, federal habeas, or even executive pardon are functionally indistinguishable. *See Heck*, 512 U.S. at 485. All exist to review a criminal conviction. Even the ensuing §1983 suit is considered part of "a single controversy" with the preceding judgments from the criminal proceeding. *See*

---

[3] Section 1983 was enacted to provide a remedy for individuals whose federal constitutional rights were deprived by state officials. *Allen v. McCurry*, 449 U.S. 90, 98-99 (1980). A principal purpose is to permit challenges to state-court criminal proceedings in which state actors violate federal constitutional rights. *Mitchum v. Foster*, 407 U.S. 225, 240 (1972). The district court's ruling thwarts this purpose by imposing a bar on Washington's claims, even though the conviction that the purportedly preclusive order was reviewing has been vacated and rendered a nullity. It is particularly inscrutable that Washington's conviction has been vacated based on Otis's recantation–an event that allows Washington to pursue § 1983 claims under *Heck*–but the district court has nevertheless bound Washington to an earlier ruling finding that this same evidence (Otis's recantation) is incredible.

Indeed, this district court's ruling runs afoul of *Heck* itself to the extent it treats as "valid and final" a state-court order affirming a conviction that has since been vacated; as noted above, *Heck* made no distinction among the types of post-conviction proceedings that could set aside the conviction sufficiently to trigger accrual of the §1983, so once that conviction has been vacated, prior state-court rulings going the other way cannot be considered valid and risk absurd inconsistencies on accrual.

*Griffin v. Baltimore Police Dep't*, 804 F.3d 692, 694 (4th Cir. 2015) ("If a §1983 plaintiff could win damages premised on the wrongfulness of a still-valid conviction, there would be two conflicting resolutions of a single controversy. *Heck,* 512 U.S. at 484. [I]t would be best not to have law at odds with itself.").  In short, *Heck* rejects the notion animating the district court's reasoning that Washington's post-conviction decision was functionally part of a different proceeding than both the WAI proceeding and the underlying criminal proceeding.

Numerous courts have declined to invoke collateral estoppel for post-conviction rulings reviewing now-vacated judgments. *See Bermudez*, 790 F.3d at 374; *Donald v. Outlaw*, 2023 WL 2346270, at *18 (N.D. Ind. Mar. 3, 2023) (collateral estoppel did not attach to a 1998 opinion affirming the denial of a post-conviction petition, and § 1983 litigation on the same issue was not precluded, because conviction was subsequently vacated); *Siggers v. Alex*, 2021 WL 4391170, at *4-6 (E.D.Mich. Sep. 24, 2021), *aff'd in part, rev'd in part and remanded*, 2023 WL 5986603 (6th Cir. Sep. 12, 2023); *Glenn*, 2021 WL 4078063, at *7-9; *Schand*, 487 F. Supp. 3d at 78; *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 392-94 (N.D.N.Y. 2018) (collateral estoppel did not attach to state appellate and federal habeas decisions after underlying conviction was vacated).

*Siggers* presents similar facts and is instructive. There, the plaintiff sought civil redress for a lengthy wrongful conviction. After years of unsuccessful state

34

and federal court post-conviction motions, in 2018, the state court agreed to vacate Siggers' conviction based on newly discovered evidence. 2021 WL 4391170, at *5. In his §1983 suit, Siggers brought claims for fabrication of evidence and failure to disclose material exculpatory evidence. Defendants sought to bar Siggers' claims under Michigan's collateral estoppel doctrine, arguing that the post-judgment state court rulings remained intact even though the underlying conviction had been vacated. The court rejected this argument. *Id.* As here, defendant cited "no authority to support his novel argument that following vacation of a judgment, only the judgment and the pre-judgment rulings lose their preclusive effect." *Id.* As a practical matter, the court found no adequate reason why "post-judgment rulings based upon a now-vacated criminal judgment should continue to retain preclusive effect…." *Id. See also Siggers*, 2023 WL 5986603 at 6 (concurring, J.) (urging majority that jurisdiction existed to address the collateral estoppel defense and noting, "I would also adopt a similar analysis as the district court and hold that such a defense fails under these circumstances").

Neither the district court nor Defendants identified any precedent in which collateral estoppel was invoked in similar circumstances. Instead, the district court relied on a single sentence from a 1966 Maryland case to support its reasoning. And a review of that case makes clear that the court's reliance was in error. *See* JA03825. In *Waller v. Dir., Patuxetnt Inst.*, 244 Md. 229, 232 (1966), the appellate

35

court affirmed the denial of a post-conviction petition. One error it alleged was the composition of the grand jury. *Id.* Maryland law, however, required grand jury challenges be brought before a conviction became final, not retroactively. *Id.* The appellate court noted that the defendant's conviction was already final because the direct appeal had concluded, so defendant's challenge came too late. *Id.* In this context, the court noted that mere filing of a post-conviction proceeding, which is collateral, does not "suspend[] the finality of the conviction" for purposes of retroactively making a grand jury challenge timely. *Id.* at 232.

The District Court stretched *Waller*'s straight-forward *dicta* to mean that if a criminal conviction got vacated by a later post-conviction proceeding, an earlier post-conviction proceeding nevertheless remains intact. JA03825. *Waller*, however, provides no support for that. All *Waller* held was that filing a post-conviction petition does not work as a stay, or suspension, of the finality of the original criminal conviction—a proposition that is hardly controversial. This was in the context of rejecting an effort to recast a post-conviction filing as a *pre*-conviction one for timing purposes. *Waller* does *not* say that if the post-conviction petition were granted, the underlying criminal conviction would remain final.

Neither does *Calhoun-El v. State of Maryland*, the other authority relied on below, require or even speak to collateral estoppel. *Calhoun-El v. State*, 2020 WL 2991786, at *14 (Md. Ct. Spec. App. June 4, 2020). *Calhoun-El* simply holds that

post-conviction petitions are collateral attacks on the underlying criminal conviction. *Id.* This uncontroversial premise is immaterial. As explained above, collateral attacks are inextricably intertwined with the underlying criminal judgment they challenge, are functionally part of the criminal proceeding, and cannot bar future relitigation once the conviction is set aside—just as happened in Washington's case.

### 3. The 1999 Order Cannot Be Considered Valid and Final After the 2016 Order.

For collateral estoppel, the federal court makes a determination about whether the state court would give preclusive effect to a prior state court judgment. While ordinarily the courts must predict what a state court would do, here no such prediction need be made: the 2016 order did not find itself estopped, despite the State's express effort to invoke estoppel. JA00373-00374. Indeed, there is no suggestion whatsoever in the 2016 order, nor in the record, that the Maryland courts intended for the 1999 Order to estop relitigation of the same factual findings. *See* JA00311-00316.

If estoppel applied, then the WAI Court would have been bound to Judge Schwait's factual determinations, but clearly that was not the case. To the contrary, the WAI Court made an opposite factual finding: that Otis's recantations to the post-conviction investigator, in the 1999 testimony (that which Judge Schwait

dubbed "incredible"), and the 2016 testimony created "a substantial possibility" that Washington would have been acquitted. JA00315-00316.

The district court attempted to reconcile these two rulings and found them not necessarily in conflict because the latter order did not use the words "coercion," "credibility," or "fabrication," so, according to the district court, Judge Schwait's earlier credibility finding must have been left intact. But the only way Judge Peters could grant a new trial was to find Otis's recantations were "material and persuasive." JA00371, citing *Campbell v. State*, 373 Md. 637, 666 (2003) (necessary element for WAI). At the post-conviction hearing, Otis testified not only about police coercion but also about the fact that he did not see Washington commit the shooting.

Robinson recanted three times, and it was the totality of those three consistent, unwavering recantations that warranted a new trial. Judge Peters expressly considered among those recantations the 1999 post-conviction testimony that Judge Schwait had deemed unreliable. Had the earlier finding enjoyed preclusive effect, however, Judge Peters could not have found "material and persuasive" that which Judge Schwait found "incredible." The fact that the WAI Court did not use the same words does not alter the fact that it made factual findings inconsistent with Judge Schwait's earlier factual findings, thus evidencing that the Maryland courts did not intend for estoppel to attach. *See Shader v.*

38

*Hampton Imp. Ass'n, Inc.* 443 Md. 148, 161 (2015) ("determination of ultimate

fact underlying the judgment in a previous proceeding is the gravamen of the

doctrine" such that when collateral estoppel is applied, "factual issues resolved in

the adjudication of one claim are binding for purposes of subsequent adjudication

of another claim").

The Maryland court did not find estoppel, thus the federal court's prediction

of what the state courts would do has been resolved. Collateral estoppel did not

apply in state court after Washington's conviction was vacated, and it should not

apply here.

### C. The 1999 Order Was Cursory and Ambiguous As To Its Factual Findings, Such That The "Actually Determined" Element Cannot Be Met.

Only issues that are "actually determined" in the prior proceeding are

precluded from being relitigated in a subsequent proceeding. *Campbell*, 852 A.2d

at 1037-38. The 1999 Order fails to identity what factual issues were actually

decided. Specifically, the circuit court failed to identify which facts about Otis it

rejected as "incredible"—whether it was the fact that he did not see the shooter

sufficiently to make an identification, or that police coerced him, or perhaps both.

It may have been, as the district court implied, a broader finding that Otis himself

was an unreliable witness. JA03823-03825.[4] The circuit court summarily found that Robinson's recantation was "incredible" and did not constitute proof of coercion. JA002475-00276. Estoppel cannot attach to such ambiguous determinations. *Cf. Ufheil Const. Co. v. Town of New Windsor,* 478 F. Supp. 766, 769 (S.D.N.Y. 1979), *aff'd sub nom. Ufheil Constr. Co. v. Town of New Windsor,* 636 F.2d 1204 (2d Cir. 1980) (ambiguous order prevented court from finding identify of issues).

The district court's reasoning exposes the difficulty with attaching preclusion to such an ambiguous order. In trying to square Judge Schwait's ruling with Judge Peters' facially contradictory findings, the court was forced to speculate about what Judge Schwait did and did not find. The district court suggested that Robinson may have voluntarily lied when identifying Washington (or did so at his mother's instruction, a speculation for which there is no support in the record) or "simply changed his mind about what he believed he saw." JA03824. Were that true, Judge Schwait's coercion ruling would remain intact, and Judge Peters could still grant a new trial. *See* JA03824 ("Judge Peters did not reverse that adverse

---

[4] These ambiguities also impede any conclusion that a particular finding was "a critical and necessary part of the decision.", 852 A.2d at 1037; *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004) (only those facts "critical and necessary" had preclusive effect, and thus, district court foreclosing relitigation of any fact supportive of the prior judgment was "too broad to assure fairness in the application of the doctrine").

credibility findings."). But an equally plausible reading is that the court determined as "false" Robinson's claim not to have seen the shooter.  If true, the WAI Court would have been bound to that and could not have found that same evidence "material and persuasive."  The 1999 Order's failure to identify which facts were "actually determined" forecloses collateral estoppel.

### D.  Applying Collateral Estoppel In This Case Is Inequitable.

In addition to not satisfying the elements of estoppel, the 1990 Order cannot be given preclusive effect because it would be inequitable to do so. Collateral estoppel is an equitable doctrine animated by principles of efficiency and fairness. *Swentek*, 830 F.2d at 563; *Brown v. City of Chicago*, 599 F.3d 772, 776 (7th Cir. 2010) (doctrine of collateral estoppel does not apply if it results in an injustice). *See also Garrity v. Maryland State Bd. of Plumbing*, 447 Md. 359, 382 (2016). Neither fairness nor equity can countenance binding Washington to a false identification (Otis's) that was procured through misconduct and which has now been thoroughly and repeatedly recanted—and never corroborated. *See Gilliam*, 932 F.3d at 232 (no collateral estoppel where convictions obtained improperly); *Bermudez*, 790 F.3d at 374 (plaintiff not collaterally estopped from arguing that witnesses were coerced even though federal habeas court found their testimony "not credible" because "applying issue preclusion would be inequitable").

41

Additional new evidence that did not exist in 1999 entirely undercuts the post-conviction factual finding that Otis' recantation was "incredible." Otis testified under oath at the 2016 WAI hearing, again insisting that he had neither seen Washington commit the shooting nor told police otherwise until they began exerting pressure on him to adopt a false identification. There were now "multiple recantations of the uncorroborated testimony by the sole eyewitness in Petitioner's case." JA0031-00316. Otis has since given a third sworn statement, this time at a lengthy civil deposition in which he recanted his false identification and explained the coercive police tactics he experienced. JA01702-01735.

In addition, another crucial piece of new evidence exists now that would render it grossly unfair to bind Washington to Judge Schwait's decades-old ruling: Rozetta Dorsey's 2022 deposition. Rozetta's sworn testimony provides crucial corroboration of Otis' recantation: both had similar experiences of being pressured and fed information by the police and testified that their initial identifications of Washington were false. With evidence from Rozetta corroborating Otis' account, the recantation testimony was far less likely to be dismissed as "incredible."

New testimony from Robinson and Dorsey significantly discredits Judge Schwait's two-decades old credibility determination and presents strong evidence that the police officers investigating the homicide manufactured the only evidence of guilt. It would be grossly inequitable for Washington to be barred, based on

now-discredited factual findings, from pursing relief under §1983 for his three decades of wrongful incarceration. *See Evans*, 445 F.3d at 956 (estoppel inequitable where prosecution witness testified about coercive police tactics and provided additional new evidence of the defendants' activities). *Cf. Montana v. United States*, 440 U.S. 147, 164 n.11 (1979) ("[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation"); *Morgan v. Morgan*, 68 Md. App. 85, 94 (1986) (finality appropriate where "no good reason" to relitigate the issue) (internal citations omitted).[5]

## II.    WASHINGTON'S FABRICATION CLAIM SHOULD BE TRIED BY A JURY.

Washington's fabrication claim relies on two pieces of evidence: Otis's and Rozetta's fabricated statements and identifications. In dismissing this claim, the district court made two fundamental errors: first, the district court applied its erroneous finding that collateral estoppel applied to bar any reliance on Otis's

---

[5] Attaching collateral estoppel to a post-conviction ruling even after the conviction is vacated could produce absurd results. *Cf. Dodrill*, 764 F.2d at 444 (considering the practical problems created if estoppel applied). For instance, if Washington had been criminally re-tried after his conviction was vacated, attaching preclusive effect to Judge Schwait's credibility determination could arguably preclude Washington from introducing Robinson's recantation, or bar him from explaining that Robinson's initial police station had been coerced—outcomes that offend basic due process requirements.

recantations and deposition testimony in this case. Second, the district court applied the wrong legal standard for fabrication, requiring that it be introduced at trial in order to be actionable—contrary to well-settled law. When those errors are rectified, it is clear that the fabrication of Otis' and Rozetta's pretrial statements and identifications should be tried by a jury.

### A. The District Court's Error in Precluding Washington from Challenging Otis's Statements and Identifications Warrants Reversal.

It is beyond dispute that fabricated evidence has no place in a criminal proceeding. *See Washington v. Wilmore*, 407 F.3d 274, 283-84 (4th Cir. 2005). To prove a fabrication claim, a plaintiff must show that (1) defendants fabricated evidence, and (2) the fabrication resulted in a deprivation of plaintiff's liberty. *Id.* at 282; *see also Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012).

The district court agreed that Washington had met this standard; he "introduced evidence, namely Robinson's [multiple recantations], that his identifications of Washington as the shooter in his police statements and sworn testimony were fabricated and coerced by the Officer Defendants." JA03822; *see also Wilmore*, 407 F.3d at 282 (fabrication where police falsely reported that witness divulged non-public information); *Shipley v. Disney*, No. CV SAG-21-3173, 2022 WL 2789076, at *6 (D. Md. July 15, 2022) (fabrication where officer created a report that falsely alleged that the eyewitness description of the suspect

44

"closely matched" the suspect in a separate homicide when it did not); *Howard v. Dowdy*, No. 1:17-CV-477, 2022 WL 1720156, at *4 (M.D.N.C. May 27, 2022), *aff'd sub nom. Howard v. City of Durham*, 68 F.4th 934 (4th Cir. 2023) (sufficient evidence of fabrication of witness statement where witness testified she did not know anything about the crime until defendant-detective fed her information).

The district court nonetheless granted summary judgment on Washington's theory of fabrication because the court found that collateral estoppel barred Washington from challenging Otis' signed statement and identification. As described above, *supra* Section I, that finding was erroneous, and because it was erroneous, so too was the Court's determination that Washington's fabrication claim was not cognizable. Instead, as the court conceded, if collateral estoppel does not apply, then Defendants' fabrication of Otis' statement and identification "present[s] a quintessential issue of fact for the factfinder . . . ." JA03822. Dismissal of the fabrication claim, therefore, should be reversed.

### B.  The District Court Erred in Finding Rozetta's Fabrication Immaterial.

Collateral estoppel also infected the district court's ruling on Washington's fabrication theory relating to Rozetta. In its summary judgment opinion, the district court found that Washington could not show that Rozetta's fabricated statement deprived Washington of liberty for two reasons: first, because Otis's signed police statement, which Washington was estopped from challenging, provided probable

45

cause; and second because Rozetta's statement was not introduced at trial. Both findings by the Court are erroneous.

### 1. When Otis's statement is properly considered, there was no probable cause.

To start, the district court found that any fabrication of Rozetta's statement did not affect Washington's probable cause because Otis had already implicated Washington, and Washington was barred from challenging Otis's police statement as fabricated JA03827. As described more fully above, the district court's collateral estoppel ruling is wrong.

Once Otis's statement and identification are considered fabricated—for purposes of summary judgment—then the district court's ruling falls apart. After all, the *only* basis for probable cause was Otis's and Rozetta's fabricated identifications. JA01551-01552; JA01153-01155. But "fabricated evidence cannot serve as the basis for probable cause." *Estate of Bryant v. Baltimore Police Dep't*, No. CV ELH-19-384, 2020 WL 673571, at *25 (D. Md. Feb. 10, 2020); *see Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017); *Miller v. Prince George's Cty.*, 475 F.3d 621, 632 (4th Cir. 2007). If Otis's statement and identification are stripped away as fabricated, then all that is left is Rozetta—and her statement and identification are fabricated, too. There is nothing on which to base charges against Washington. *See Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017), *as amended* (Aug. 22, 2017) ("To determine materiality,

the Court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause.") (internal quotations omitted). Stated differently, Rozetta's fabricated statement caused Washington's loss of liberty because probable cause for Washington's arrest did not exist independent of the fabrications. *See Miller*, 475 F.3d 621, 628 (4th Cir. 2007) (holding that civil liability against an officer could be found because the warrant, once excised of fabricated information, did not establish probable cause.).

### 2. Rozetta's statement did not have to be introduced at trial to deprive Washington of his liberty.

Alternatively, the district court found that Washington could not satisfy the causation prong of a fabrication claim because Rozetta's "statement played no role once the charges against Washington were brought . . . JA03828. That finding runs afoul of well-settled law.

Contrary to the district court's opinion, fabricated evidence need not be introduced at trial to be actionable. *See Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834, 2017 WL 4947004, at *16 (D. Md. Oct. 31, 2017) (finding "causation under *Washington*" satisfied where police fabricated report hiding the existence of an eyewitness notwithstanding the fact that the report was not introduced at trial). "[T]he relevant question is not whether the fabricated evidence

was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019); *see also Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in *some way*.")."And fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Jackson*, 925 F.3d at 816 (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)).

Rozetta's statement and identification were critical for probable cause—*i.e.*, the "basis for [the] criminal charge." *Jackson*, 925 F.3d at 816. Washington was indicted and placed into custody because of Rozetta's fabricated identification, not just Otis's. JA02748; JA02057-02061; JA01551-01552; JA01153-01155. That is sufficient for fabrication. It is particularly true because had Washington known about the fabrication of Rozetta's statement and the circumstances surrounding it, Washington could have corroborated Otis and attacked the honesty of the investigation. *See*, *e.g.*, *Long v. Hooks*, 972 F.3d 442, 485 (4th Cir. 2020), *as amended* (Aug. 26, 2020) ("The officers' dishonesty would undermine the integrity of the investigation."); *Barnett v. Cabell County Comm'n*, No. CV 3:22-0203, 2023 WL 2602509, at *9 (S.D.W. Va. March 22, 2023)

Moreover, when evaluating causation—that is, whether Rozetta's fabrication caused Washington to lose his liberty, and whether it was reasonably foreseeable that he would—courts are instructed to take all the fabricated evidence together collectively. Although the district court referred to Washington's "coercion/evidence fabrication claims," "his allegations do not give rise to separate *claims* under Section 1983." *Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019); JA03821. Rather, Washington "has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights." *Goudy*, 922 F.3d at 838 (causation requires courts to "examine[] the cumulative effect of all false and misleading evidence" as opposed to taking each instance of fabrication on its own. *United States v. Alahmedalabdaloklah*, 76 F.4th 1183, 1231-32 (9th Cir. 2023)); *see also Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *10 (N.D. Ill. Sept. 30, 2023) (alleged fabricated evidence evaluated in the aggregate"); *cf. Juniper v. Davis*, 74 F.4th 196, 211–13 (4th Cir. 2023).

When Otis and Rozetta's fabrications are analyzed collectively, there is no legitimate dispute that they were both the "but-for" and "proximate cause" of Washington's wrongful conviction and attendant loss of liberty. *Gilliam*, 932 F.3d at 283. Without those fabrications, there would have been no evidence of Washington's alleged guilt and no prosecution in the first instance. *See*, *e.g.*,

*Johnson v. Gondo*, No. CV GLR-19-995, 2020 WL 1529002, at *6 (D. Md. Mar. 31, 2020) (allowing claims to proceed where plaintiff's guilty plea would not have been entered "but for [police officers'] fabrication"); *Rizk v. Mehirdel*, No. 14-CV-06434 (HG), 2022 WL 5184709, at *5 (E.D.N.Y. Oct. 5, 2022) (reasonable jury could find prosecutors would not have brought charges but for fabricated evidence).

## III.    A Trial Is Required on Washington's Suppression of Evidence Claim.

To establish a constitutional violation based on the police's suppression of exculpatory evidence, Washington must demonstrate that the suppressed evidence was material and favorable to him and Defendants suppressed the evidence in bad faith. *See Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014); *Gilliam*, 932 F.3d at 283. Washington alleges that Defendants failed to disclose (1) Otis's and Rozetta's statements that they could not identify the shooter, and (2) their use of threats, feeding of facts, and other coercive tactics to extract these false identifications (collectively referred to as "exculpatory evidence").

In dismissing Washington's suppression claim, the district court erroneously concluded that there was no evidence on which a jury could reasonably rely to conclude that Defendants withheld evidence from the prosecutor. This finding,

however, is belied by the record, which contains direct and circumstantial evidence on that issue.[6]

Washington has adduced sufficient evidence from which a jury could conclude it was Defendants, not the prosecutor, who suppressed the exculpatory evidence. First, Defendants deny that the exculpatory evidence exists in the first place; they deny that Otis and Rozetta ever said they could not identify the shooter, or that they employed any coercive tactics. *See* JA00059-00060; JA01005-01006; JA01493, JA01539-01540. Consistent with those denials, Pellegrini's admitted that he did not disclose the exculpatory evidence to the prosecutor. JA01121-01122. A jury could reasonably rely on the denials and this admission to find that suppression.

The district court credited Defendants' testimony about generally disclosing exculpatory evidence to the prosecutor and used this testimony to undermine Washington's suppression claim. JA03831. But the court may not selectively weigh the evidence at summary judgment: Defendants' testimony was that *in this*

---

[6] The district court also considered that circumstantial evidence has less probative value on the bad faith element, but that is not the law. *Wyatt v. Cole*, 504 U.S. 158, 174 (1992) (concurring); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 764 (4th Cir. 2021). On these facts, Washington has demonstrated Defendants' bad faith. *See Gilliam*, 932 F.3d at 240(finding bad faith where Defendants fabricated evidence and suppressed exculpatory evidence).

*case*, there was no exculpatory evidence to disclose. It does not matter what Defendants' disclosure habits were when they maintain there was nothing to disclose.

Second, there is no documentation in the homicide file memorializing the exculpatory evidence. *See generally* JA01980-JA02094, JA03723-03745. Otis testified that Pellegrini memorialized Otis's statement that he could not identify the shooter in handwritten notes. JA01727. This observation was consistent with Pellegrini's admitted practice of taking notes when conducting a preliminary interview. JA01039. Pellegrini ordinarily turned such notes over to Requer to put in the homicide file. JA01102. But, although the homicide file contains pages of handwritten notes documenting information received for multiple witnesses, there are no notes or reports documenting these initial police statements disavowing knowledge of the shooter.

There is no dispute that the homicide file is incomplete, but there is evidence that supports an inference that even a complete homicide file still would not contain any memorialization of the impeachment evidence. Pellegrini provided a sworn interrogatory response regarding documents missing from the homicide file. JA03607-03608. In his response he identified two types of missing documents: polaroid photographs and a statement from Rozetta on December 27, 1986. JA03607-03608. Significantly, Pellegrini does not identify any missing notes, prior

memorialized statements, or reports relating to Otis's December 29, 1986, interview, nor Rozetta's January 3, 1987, interview (the interview in which Rozetta testified that she again told Defendants she could not identify the shooter and also did not identify Washington as the shooter). JA03607-03608; JA0255802562.

Notwithstanding this evidence, the district court ruled that Washington failed to meet his burden—namely, that he failed to show that the exculpatory evidence was not turned over. But the summary judgment record, properly construed, permits only one reasonable conclusion: Washington did not have the exculpatory evidence and neither did the prosecution.

For starters, the State's pre-trial discovery disclosures explicitly stated that no exculpatory evidence was disclosed. JA00242; JA00244. Otis's and Rozetta's initial police statements revealing that they could not identify the perpetrator inarguably constituted the kind of exculpatory evidence that would be disclosed here, but it was not listed. Nor were the coercive police tactics leading up to the signed statements. *See* JA00242; JA00244; *compare* JA00245 (indicating through a handwritten note that evidence relevant to paragraph 9 was attached).

The trial prosecutor, Ruth Finch, testified to her disclosure practices and made clear that the State's lack of disclosure about Otis's and Rozetta's impeachment evidence was due to a lack of knowledge, rather than prosecutorial suppression. In her deposition, Finch testified that she took her obligations as a

prosecutor seriously, which included disclosing exculpatory and impeaching evidence to the defense. JA02929-02930. Finch further testified that if police told her that Otis initially stated that he could not identify the shooter, she would have disclosed that information to the defense. JA02970-02971. Similarly, Finch would have disclosed the destruction of evidence memorializing exculpatory evidence (notes documenting the witnesses' initial accounts) and police threats to take a child away from their parent unless they cooperated with the investigation (as Otis alleges they did to him). JA02971-02974, JA02976-02978, JA02982.

In violation of the summary judgment standard, the district court elected not to credit this evidence and instead focused on the fact that Finch did not specifically recall Washington's prosecution. JA03705-03707. This was contrary to the law. It is not unusual or problematic that Finch cannot specifically recall what actions she took during Washington's prosecution because a lack of recollection is a common issue in witness testimony. This is why the Federal Rule of Evidence 406 allows for the admission of habit evidence. Fed. R. Evid. 406; *see Sheetz v. Wal-Mart Stores, E., L.P.*, No. 4:15-CV-02210, 2017 WL 5625770, at *2 (M.D. Pa. Nov. 22, 2017) ("The purpose of habit evidence is fill the gap in direct evidence about what [a person] did on a specific occasion with circumstantial evidence sufficient to reasonably allow one to conclude that the [person] probably acted in conformity with [the] usual patter on the occasion in question.").

Finch was a prosecutor for almost 11 years, about eight of which were prior to Washington's trial, and she testified that throughout her career she complied with her disclosure obligations. JA02814-02815, JA02929-02930. This is precisely the type of habit evidence a jury could rely on to find that Finch's lack of disclosure was because Defendants did not inform her of the exculpatory evidence. The district court should have considered and credited this evidence at summary judgment. *See Howard*, 68 F.4th at 951 ("[C]ourt may accept Rule 406 evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out.").

Further proof that the exculpatory evidence had not been produced comes from Washington's suppression hearing—because if his defense attorney Paul Polansky had it, he would have used it.[7] The very purpose of Washington's motion to suppress was to exclude Otis's identification. JA02750-02752. Polasky specifically questioned Pelligrini about the circumstances of Otis's statement and photo identification and did not impeach Pellegrini. *See generally* JA02786-02787, JA02793-02797. The only reasonable inference here is that Polanksy was not given Otis's initial, exculpatory statement, *not* that Polansky filed that evidence away and

---

[7] The district court also incorrectly states that the "sole" basis for Washington's suppression claim derived from inferences based on Polansky's witness examinations. JA03831-03832. To the contrary, as detailed above, Washington presented multiple arguments in support of his suppression claim.

chose not to use it. By refusing to credit this evidence and drawing reasonable

inferences therefrom, the district court deviated from the summary judgment

standard. JA03831-03833. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986) ("The evidence of the non-movant [here, Washington] is to be believed, and

all justifiable inferences are to be drawn in his favor.").

A jury could reasonably rely on Defendants' denials, Pellegrini's admission,

the homicide file, Finch's lack of disclosure, the omissions from Pellegrini's list of

missing documents, and Polansky's witness examinations to infer that Defendants

did not disclose the impeachment evidence to the prosecutor. The district court

erred when it disregarded this evidence.[8]

---

[8] In a footnote, the district court wondered about an alternative basis to deny
Washington's suppression claim, opining that there is a "significant question"
about whether the exculpatory evidence was material. JA03832. The answer is:
Yes, the exculpatory evidence was material to the issues in Washington's criminal
trial.  Evidence is material in the context of suppression claims if it "undermines
confidence in the verdict." *Youngblood v. W. Virginia*, 126 S. Ct. 2188, 2190 (2006).
Under *Brady*, evidence is material when there is 'any reasonable likelihood' it
could have 'affected the judgment of the jury.' *" Id.* Materiality must be evaluated
based on the cumulative effect of all suppressed evidence and not in isolation piece
by piece. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *Kyles v. Whitley*, 514 U.S.
419, 421 (1995). Ultimately, materiality is a jury question. *See Wearry*, 136 S.Ct. at
1006-07.

Here, the only evidence used to charge Washington were the "eyewitness"
accounts from Otis and Rozetta, just as the only evidence used to convict Mr.
Washington was Otis' statement. Without their statements, there was no case. Otis
and Rozetta's truthful accounts to the police were, therefore, unquestionably
material. *See*, *e.g.*, *Wearry*, 136 S. Ct. at 1004-05 (police and other records that

## IV. WASHINGTON'S FEDERAL UNLAWFUL DETENTION AND MALICIOUS PROSECUTION CLAIMS MUST BE TRIED.

Washington's claims for unlawful detention and malicious prosecution also rose and fell with the district court's collateral estoppel finding. When the evidence of fabrication is properly credited, this prosecution lacked any probable cause, and Washington's claims should proceed to trial.[9]

## V. WASHINGTON'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM MUST BE TRIED.

The district court's erroneous collateral estoppel ruling infected Washington's claim intentional infliction of emotional distress ("IIED") claim,

---

could have been used to impeach a state's witness were material); *Smith v. Cain,* 565 U.S. 73, 74-75 (2012) (information that eyewitness could not see a perpetrator's face though he later identified defendant at trial was material).

The evidence about the circumstances of Otis's and Rozetta's interviews was also material to impeach the integrity of the police investigation and the State's trial theory, and Rozetta's coercion strongly corroborated Otis' independent recantation. *See Kyles,* 514 U.S. at 447-49 (finding that the suppressed witness statement could have been used by the defense to argue that the police "set up" the defendant); *United States v. Bagley*, 473 U.S. 667, 683-84 (1985) (holding that undisclosed evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material); *Owens*, 767 F.3d at 397-98 (4th Cir. 2014); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d at 846-47.

[9] So, too, for Washington's failure to intervene claim, as well as his state law claims, which were dismissed owing to the collateral estoppel ruling. Because the district court's dismissal was erroneous and must be reversed, Washington's failure to intervene and state law claims should be reinstated. The district court did not address Defendants' qualified immunity defense in light of its rulings, so that issue (which is unavailable on these facts, *see* JA00479-00481) is not part of this appeal.

because the court concluded that if Washington was estopped from proving that Defendants manufactured guilt evidence, he also could not prove the "requisite extreme and outrageous conduct to mount an IIED claim." When Defendants' misconduct in procuring Otis' and Rozetta's fabricated evidence is considered, however, Washington's IIED claim survives. There is sufficient evidence in the record for a reasonable jury to decide that Defendants suppressed and fabricated material evidence in order to arrest, charge, prosecute, convict, and imprison Washington for decades for a crime he did not commit. *See* Sections II-III, *supra*. There can be no dispute that such conduct, if proven, is "extreme and outrageous." *See Burgess*, 2017 WL 4947004, at *22 (D. Md. Oct. 31, 2017); *Harris v. Jones*, 380 A.2d 611, 615-16 (Md. Ct. App. 1977); Restatement (2d) of Torts § 46, cmt. (e).

Alternatively, the district court found that Washington "ha[d] not adduced sufficient evidence of severe emotional distress" because he is currently "living a productive life . . . ." JA03836. This ruling is impossible to square with Washington's 31 years of wrongful conviction, and the testimony Washington gave on that score.

To be "severe," emotional distress "'need not produce total emotional or physical disablement' and 'severity must be measured in light of the outrageousness of the conduct and the other elements of the tort.'" *Brengle v.*

58

*Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 455 (D. Md. 2011) (quoting *B.N. v.*

*K.K.*, 312 Md. 135, 148 (Md. Ct. App. 1988)). Washington testified that prison was

"inhumane": he was forced to live in a cell for three decades, torn from his young

son, partner, and other family and friends; subject to repeated lockdowns, confined

with cellmates were often unpredictable and suffered from severe mental illness;

and experienced violence and intrusive searches by correctional officers. JA00621-

00627; JA03343-03344. Since leaving prison, Washington suffers from sleep

deprivation and nightmares about his wrongful conviction and imprisonment.

JA00621-00622. This is sufficient—particularly at summary judgment—to set

forth "severe" emotional distress. *See Brengle.*, 804 F. Supp. 2d at 456 (severe

emotional distress properly alleged where plaintiff alleged "severe anxiety,"

"isolation," "extreme sadness" and that the distress was disabling).

Additionally, a jury can infer severe emotional distress from Defendants'

misconduct. *See Harris*, 380 A.2d at 615-16. It is hard to imagine anything more

disabling and devastating than being in prison for 31 years for a crime you did not

commit. *Id*.; *cf. Schlup v. Delo*, 513 U.S. 298, 324 (1995) (injustice that results

from the conviction of an innocent person is at the "core of our criminal justice

system").

## CONCLUSION

For the foregoing reasons, Washington respectfully asks this Court to reverse the district court's grant of summary judgment and remand this case for trial.

Respectfully submitted,

**GARY WASHINGTON**

By: /s/ Renee Spence
*One of Plaintiff-Appellant's Attorneys*

Attorneys for Plaintiff-Appellant
Jon Loevy
Gayle Horn
Roshna Bala Keen
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, IL 60607
(312) 243-5900
spence@loevy.com

60

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of authorities, statement regarding oral argument, signature block, certificates of counsel, addendum attachments):

      This document contains 12,929 words by using Microsoft Word 2010 to calculate the word count.

2.    This document complies with the typeface requirements because:

      This document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: October 24, 2023

                      /s/ Renee Spence
                      Renee Spence
                      Loevy & Loevy
                      311 N. Aberdeen St., 3rd FL
                      Chicago, IL 60607
                      (312) 243-5900 - Telephone
                      (312) 243-5902 - Facsimile
                      spence@loevy.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

/s/ Renee Spence
Renee Spence
Loevy & Loevy
311 N. Aberdeen St., 3rd FL
Chicago, IL 60607
(312) 243-5900 - Telephone
(312) 243-5902 - Facsimile
spence@loevy.com
